IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01412-RBJ-CBS

SANDY SUSAN SEELY,
     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner, Social Security Administration,
     Defendant.

_____

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Craig B. Shaffer

This civil action comes before the court pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, for review of the Commissioner of Social Security's final decision denying Plaintiff, Ms. Seely's, application for Disability Insurance Benefits ("DIB"). Pursuant to the Order of Reference dated July 16, 2012, this civil action was referred to the Magistrate Judge to "submit proposed findings of fact and recommendations for rulings regarding Plaintiff's appeal of the Social Security Administration's final determination." (*See* Doc. # 18). The court has reviewed the Complaint (filed May 27, 2011) (Doc. # 1), Defendant's Answer (filed August 8, 2011) (Doc. # 7), Plaintiff's Opening Brief (filed October 14, 2011) (Doc. # 14), Defendant's Response Brief (filed November 14, 2011) (Doc. # 15), Plaintiff's Reply Brief (filed November 29, 2011) (Doc. # 16), the entire case file, the administrative record, and the applicable law and is sufficiently advised in the premises.

I.     Procedural History

On June 14, 2007, Ms. Seely filed an application for DIB under Title II of the Act. (*See*

Record (Doc. # 8-5) at 2-4 of 29).  Ms. Seely alleged that she became disabled on October 25, 2005 at the age of 46 due to herniated discs in her neck and "nerve damage in back of head."  (*See* Record (Doc. # 8-6) at 31 of 92).  The claim was denied at the initial determination stage on October 23, 2007 and Ms. Seely requested a hearing.  (*See* Record (Doc. # 8-3) at 2 of 2; (Doc. # 8-4) at 1-5 of 35).  Administrative Law Judge Kathryn D. Burgchardt ("ALJ") held a hearing on December 16, 2009.  (*See* Record (Doc. # 8-4) at 12 of 35; Doc. # 8-2 at 33-73 of 78).  Ms. Seely was represented by counsel and testified at the hearing.  (*See* Record (Doc. # 8-2) at 36-59 of 78).  Mr. Martin Rauer testified at the hearing as a vocational expert ("VE").  (*See* Record (Doc. # 8-2) at 59-71 of 78).  Following the hearing, Ms. Seely submitted additional testimony by an affidavit.  (*See id.* at 74-75 of 78).  The ALJ issued her written decision on January 8, 2010, concluding that Ms. Seely was not disabled under the Act because based on her "age, education, work experience, and residual functional capacity," she "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (*See* Record (Doc. # 8-2) at 17-27 of 78).  On March 8, 2010, Ms. Seely requested review of the ALJ's decision.  (*See* Record (Doc. # 8-2) at 11-13 of 78).  The Appeals Council denied Ms. Seely's request for review on March 29, 2011.  (*See* Record (Doc. # 8-2) at 2-6 of 78).  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981;  *Neilson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Ms. Seely filed this action on May 27, 2011.  The court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

II.     Standard of Review

       In reviewing the Commissioner's final decision, the court must "closely examine the

record as a whole to determine whether the . . . decision is supported by substantial evidence and adheres to applicable legal standards." *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (internal quotation marks and citation omitted). *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (court "must determine whether the . . .  decision of nondisability, reached through action of the Appeals Council, is supported by substantial evidence, *i.e.*, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks and citation omitted); *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) ("Substantial evidence is more than a scintilla, but less than a preponderance; . . .") (citation omitted).  The court "must affirm . . . if the decision is supported by substantial evidence." *Eggleston v. Bowen*, 851 F.2d 1244, 1246 (10th Cir. 1988) (citing  42 U.S.C. § 405(g)).  The court "may neither reweigh the evidence nor substitute [its] judgment for the [Commissioner's]." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001).  *See also Mounts v. Astrue*, No. 11-1172, 2012 WL 1609056, at * 8 (May 9, 2012) (court cannot reweigh the evidence and come to a different conclusion than the ALJ) (citation omitted).

III.    Ms. Seely's Challenge to ALJ's Decision

An individual is eligible for DIB benefits under the Act if she is insured for DIB, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1).  An individual "shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. §§ 423(d)(2)(A).

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. *See Williams*, 844 F.2d at 750-52 (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750. "The claimant bears the burden of proof through step four of the analysis." *Neilson*, 992 F.2d at 1120. At step four of the evaluation process, an ALJ must determine a claimant's Residual Functional Capacity (RFC) and then compare the RFC to his or her past relevant work. The RFC is what a claimant is still "functionally capable of doing on a regular and continuing basis, despite [her] impairments; the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. At step four, a claimant has the burden of showing he or she cannot return to his or her past relevant work, that is, his or her specific job or that type of work in general. 20 C.F.R. § 404.1520; *Neilson*, 992 F.2d at 1120; *Jozefowicz v. Heckler*, 811 F.2d 1352, 1356 (10th Cir. 1987) (citations omitted).

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account his or her residual functional capacity (RFC), age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .

> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must

then consider all relevant facts to determine whether the claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.

. . .

Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain. . . .

*Williams*, 844 F.2d at 751-52.

Following the five-step evaluation process, the ALJ determined that Ms. Seely: (1) had not engaged in substantial gainful activity since the alleged onset date of disability on October 25, 2005; (2) had severe impairments of "degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder, and right sided thoracic outlet syndrome;" (3) did not have an impairment or combination of impairments listed in or medically equal to one listed in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526); (4) has the RFC "to perform light work as defined in 20 C.F.R. § 404.1567(b), while lifting and carrying up to ten pounds frequently, and up to twenty pounds occasionally; sitting and standing/walking for up to five hours each in a regular eight hour work day; avoiding overhead reaching bilaterally; [avoiding] frequently climbing ladders and stairs; and while only occasionally balancing, stooping, crouching, kneeling, or crawling;" and (5) is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*See* Record (Doc. # 8-2) at 19-27 of 78). Ms. Seely challenges the ALJ's determination at step four of the evaluation process, claiming that the Commissioner erred: (1) by failing to find that her headaches, vision problems, and depression are severe impairments that limit her RFC; and (2) by relying on an RFC determination four years after Ms. Seely was in a motor vehicle accident in 2005 and her condition was improved by multiple

5

treatments "and in failing to address the longitudinal history of claimant's condition and whether during the duration of that history, she was disabled for more than one year." (*See* Doc. # 14 at 3 of 39;  Doc. # 16 at 6-11 of 12).

A.    Analysis

At step four, Ms. Seely has the burden of showing she cannot return to her past relevant work or that type of work in general.  Before the ALJ assessed whether Ms. Seely could perform her past relevant work, the ALJ had to determine her RFC "based on all the relevant medical and other evidence" in the case record.  20 C.F.R. § 404.1520(a)(iv), (e). RFC determinations are for the ALJ to make "based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009).  *See also* 20 C.F.R. § 404.1546 (ALJ is responsible for assessing residual functional capacity); *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990) (when determining claimant's credibility and assessing his residual functional capacity, the ALJ properly considered "all" of the evidence, both medical and nonmedical, as he was required to do).

At step four, the ALJ found that Ms. Seely had the RFC to: perform light work as defined in 20 C.F.R. § 404.1567(b), while lifting and carrying up to ten pounds frequently, and up to twenty pounds occasionally; and sit and stand/walk for up to five hours each in a regular eight hour work day.  (*See* Record (Doc. # 8-2) at 21 of 78).  The ALJ found that Ms. Seely should avoid "overhead reaching bilaterally" and "frequently climbing ladders and stairs," and only occasionally balance, stoop, crouch, kneel, or crawl." (*See id.*).  Ms. Seely argues that the ALJ erred in evaluating her RFC.  (*See* Doc. # 14 at 30-38 of 39).

1.    Medical Record

Ms. Seely was involved in an automobile accident on October 24, 2005.  (*See* Record

(Doc. # 8-7) at 16-25 of 65).  In October and November 2005, Ms. Seely saw Ellen Martin,

M.D., who prescribed medication for cervical strain with muscle spasm, mild thoracic strain,

and right shoulder strain.  (*See* Record (Doc. # 8-7) at 45-48 of 65).  Ms. Seely was examined

by Dr. Mara Isser, D.O. at Spine Colorado on October 26, 2005 for complaints of neck strain

and right arm and hand pain.  (*See* Record (Doc. # 8-8) at 82-83 of 121).[1]  X-rays showed no

evidence of fracture or instability.  (*See id.* at 82 of 121).  Dr. Isser found Ms. Seely had

normal strength, reflexes, and sensation in all extremities, with the exception of reduced

("4/5") strength with right shoulder abduction and elbow flexion, and decreased cervical range

of motion.  (*See id.* at 82 of 121).  Dr. Isser diagnosed neck pain, right arm weakness, and

cervical spondylosis and prescribed Motrin, Flexeril, and physical therapy.  (*See id.*).  She also

ordered an MRI of the cervical spine, which showed a disc protrusion at C5-6 with central and

right foraminal narrowing.  (*See id.* at 87 of 121).  Dr. Isser referred Ms. Seely to Gary A.

Scott, M.D., an orthopedic surgeon at Durango Orthopedics, regarding her shoulder.

Dr. Scott examined Ms. Seely on November 8, 2005 for her complaint of right shoulder

pain.  (*See* Record (Doc. # 8-8) at 79-81 of 121).  Dr. Scott diagnosed acute rotator cuff

tendinitis with early subacromial bursitis, and recommended Aleve, physical therapy, and a

subacromial injection.  (*See id.*). On November 10, 2005, Ms. Seely reported complete relief

of right shoulder pain after Dr. Scott administered shoulder injections.  (*See* Record (Doc. #

8-8) at 77-78 of 121).

Dr. Isser saw Ms. Seely on November 14, 2005 and noted that she was feeling better

---

[1]    At a later date Dr. Isser's name changed to Dr. Isser-Sax.

but continued "to have symptoms as well as weaknesses." (*See* Record (Doc. # 8-8) at 74-75 of 121). Dr. Isser found Ms. Seely had normal gait, normal affect, limited range of motion in the right shoulder, full strength in the upper extremities except for 4/5 strength in the right triceps and wrist extensor muscles, and numbness in the C7, C8, and T1 dermatomes. (*See id.* at 75 of 121). Dr. Isser diagnosed cervicalgia, muscle weakness, cervical spondylosis, and cervical radiculopathy, and prescribed steroids and physical therapy. (*See id.*). On November 23, 2005, Dr. Isser administered occipital nerve block injections for Ms. Seely's complaints of constant headaches. (*See* Record (Doc. # 8-8) at 70-73 of 121). Dr. Isser referred Ms. Seely to psychologist Ed Cotageorge, Ph.D. "regarding her emotional lability and decreased concentrations." (*See id.* at 66 of 121).

On December 1, 2005, Dr. Scott observed that Ms. Seely had marked reduction of pain and improved functionality following the shoulder injection. (*See* Record (Doc. # 8-8) at 68-69 of 121). Ms. Seely demonstrated excellent flexion and abduction in the right shoulder and reported only "a very slight transient discomfort" with shoulder movement. (*See id.* at 68 of 121).

On December 21, 2005, Ms. Seely reported to Dr. Isser improvement from the occipital nerve blocks and improvement of her pain overall, but complained of difficulty with memory, concentration, and emotional ability, and episodes of dizziness. (*See* Record (Doc. # 8-8) at 65-66 of 121). Dr. Isser ordered an MRI scan of the brain, which was conducted on December 27, 2005 and resulted in normal findings.

On January 23, 2006, Dr. Isser saw Ms. Seely for complaints of headaches and neck and arm pain. (*See* Record (Doc. # 8-8) at 62-63 of 121). Dr. Isser found Ms. Seely had normal strength, reflexes, and sensation in the upper extremities and normal range of motion

in the neck. (*See id.* at 62 of 121). Dr. Isser administered another occipital nerve block injection and scheduled a C2-3 medial branch block. (*See id.* at 61, 63 of 121). Dr. Martin also saw Ms. Seely on January 23, 2006, noting that the "only meds she is taking is Ibuprofen 600 mg TID and occasionally a Valium at bedtime." (*See* Record (Doc. # 8-7) at 41 of 65).

Dr. Cotageorge evaluated Ms. Seely on January 31, 2006 and February 7, 2006. (*See* Record (Doc. # 8-7) at 2-10 of 75). He concluded that she experienced significant emotional trauma and reactive depression as a result of her injury, had minimal coping skills to handle the functional and secondary losses associated with her injury, and "likely" experienced diminished attention and memory abilities. (*See id.* at 9-10 of 75). He rated her Global Assessment of Functioning ("GAF") at 50. (*See id.* at 10 of 75).[2]

Ms. Seely had C2-3 nerve block injections on February 8, 2006. (*See* Record (Doc. # 8-8) at 55-61 of 121). On February 20, 2006, she reported significant relief from her headaches but complained of lower neck pain. (*See* Record (Doc. # 8-8) at 53 of 121). Dr. Isser recommended radio frequency lesioning of the third occipital nerve, which was performed on March 29, 2006 by Cyril Bohachevsky, M.D. (*See* Record (Doc. # 8-8) at 50-53 of 121).

In March 2006, Ms. Seely again saw Dr. Martin because "the Insurance MD" felt she was depressed and might benefit from medication. (*See* Record (Doc. # 8-7) at 38 of 65). Dr. Martin noted that Ms. Seely was slowly improving, had greater range of motion in the neck,

---

[2]        GAF is a numeric scale of 0 through 100 used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. The scale is presented and described in the American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) ("DSM-IV-TR") on page 34. The score is often given as a range, such as 61 - 70 ("Some mild symptoms (e.g., depressed mood and mild insomnia . . ."), 51 - 60 ("Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks . . .").

and was using medication minimally. (*See id.*).  Dr. Martin diagnosed chronic neck pain, headaches, and "very mild depression because of situation," and noted that Ms. Seely would consider antidepressant medication in the future. (*See id.*).  In April 2006, Dr. Martin noted that Plaintiff's only chronic medication was Valium at night and that she was "still not depressed." (*See id.* at 36 of 65).

On April 28, 2006, Ms. Seely reported to Dr. Isser that her headaches and neck pain had improved and that she was sometimes headache-free. (*See* Record (Doc. # 8-8) at 47 of 121).  Ms. Seely reported that she "works out very aggressively at home, and she feels this is helping.  She feels she is getting stronger." (*See id.*).  She had tried multiple jobs, including a newspaper route, but driving and turning her head increased her pain. (*See id.*).  Dr. Isser continued her medications "as needed." (*See id.* at 48 of 121).

On May 23, 2006, Ms. Seely reported to Dr. Isser pain in her occipital region, neck, right shoulder, and right elbow, and parasthesias in her pinky finger. (*See* Record (Doc. # 8-8) at 44-45 of 121).  She rated her pain as "4 out of 10" and reported that her medications were effective and that her strength was improving. (*See id.*).  Dr. Isser recommended Botox neurolysis for headaches and upper muscular pain. (*See id.*).  On June 2, 2006, Dr. Martin noted that Ms. Seely occasionally took a Valium and took only Ibuprofen for pain.   (*See* Record (Doc. # 8-7) at 33 of 65).

On July 3, 2006, Dr. Isser recorded that Ms. Seely felt "very much improved" overall and was using her medications less frequently. (*See* Record (Doc. # 8-8) at 41-42 of 121).  Dr. Isser continued her medications and exercise program. (*See id.*).  On July 17, 2006, Ms. Seely reported to Dr. Scott that her shoulder pain "got precipitously worse after some kayaking." (*See* Record (Doc. # 8-8) at 37 of 121).  Dr. Scott administered subacromial

injections, which brought "striking relief" from pain.  (*See* Record (Doc. # 8-8) at 37-40 of 121).

On August 3, 2006, Ms. Seely saw Dr. Isser for complaints of continuing pain and numbness in her neck, right shoulder, and fingers.  (*See* Record (Doc. # 8-8) at 33 of 121). Dr. Isser administered trigger point injections in the trapezius muscles.  (*See id.* at 33-36 of 121).  Ms. Seely told Dr. Isser that she planned to do "some odd jobs" but felt she lacked sufficient manual dexterity to pursue her former commercial painting business.  (*See id.* at 33 of 121).  On September 14, 2006, Ms. Seely reported to Dr. Isser that the trigger point injections had "helped significantly" and that she was "requiring less medication" and "getting better range of motion and strength."  (*See* Record (Doc. # 8-8) at 29 of 121).

On December 13, 2006, Ms. Seely saw Dr. Isser with complaints of neck pain and right hand numbness.  (*See* Record (Doc. # 8-8) at 26-27 of 121).  Ms. Seely stated that she had been unable to continue her former business as a commercial painter since her automobile accident but had worked for three months as an art teacher without pain.  (*See id.* at 26 of 121).  She said she was unable to teach for more than three months in part because she lacked certification.  (*See id.*).  Dr. Isser stated that she did "not believe she can return to her previous job as an independent commercial painter" and recommended vocational training. (*See id.* at 27 of 121).

On December 18, 2006,  Ms. Seely reported to Dr. Scott that her right shoulder pain had returned.  (*See* Record (Doc. # 8-8) at 22-23 of 121).  Dr. Scott concluded that an MRI study performed on December 27, 2006 showed mild arthrosis and that she had signs and symptoms consistent with impingement.  (*See id.* at 18-20 of 121).  Dr. Scott performed diagnostic arthroscopic/decompression surgery on January 3, 2007.  (*See id.* at 17 of 121; Doc. # 8-9 at 56-62 of 112).

Ms. Seely received physical therapy at Integrated Physical Therapy from November 2005 to September 2006 and was discharged on December 19, 2006.  (*See* Record (Doc. # 8-9) at 17, 20-44 of 112).  At the time of her last visit, on September 14, 2006, her functional level had improved, her treatment goals had been met, and she no longer needed physical therapy.  (*See id.*).

On March 8, 2007, Ms. Seely presented "an almost rosy picture of how much better things are."  (*See* Record (Doc. # 8-8) at 13 of 121).  Dr. Scott found she had excellent range of motion, good strength, and only slight discomfort with certain maneuvers.  (*See id.* at 13 of 121).

On March 27, 2007, Dr. Isser saw Ms. Seely with complaints of headaches, pain in her neck and right trapezius muscle, and numbness in the right index finger.  (*See* Record (Doc. # 8-8) at 13 of 121).  "She is feeling that all of her pain, including her shoulder pain is improved. . . her strength is improved," and she takes less medication.  (*See id.* at 10-11 of 121).  She was "doing some miscellaneous work, including substitute teaching."  (*See id.* at 10 of 121).  Dr. Isser found Ms. Seely had full range of motion in the neck.  (*See id.*).

On April 5, 2007, Ms. Seely reported to Dr. Scott that she was "gradually getting better" and "can easily workout [sic]."  (*See* Record (Doc. # 8-8) at 13 of 121).  Ms. Seely saw Dr. Isser on May 23, 2007 for complaints of neck pain and headaches.  (*See* Record (Doc. # 8-8) at 7-8 of 121).  Ms. Seely reported that she was "currently working, doing multiple odds and ends jobs."  (*See id.* at 7 of 121).  Dr. Isser referred her to Jim A. Youssef, M.D. for a surgical consultation.  (*See id.*).  In a form submitted to the Colorado Department of Human Services, dated June 11, 2007, Dr. Isser indicated that Ms. Seely was not totally disabled but had an impairment that precluded her from engaging in her usual occupation for a period of six

months or longer.  (*See* Record (Doc. # 8-7) at 64-65 of 65).

Dr. Youssef examined Ms. Seely on June 7, 2007.  (*See* Record (Doc. # 8-8) at 3-6 of 121).   Ms. Seely reported experiencing headaches, neck and shoulder pain, concentration difficulties and mood swings since her motor vehicle accident.  (*See id.* at 3 of 121).  She also complained of occasional loss of vision, occasional dizziness, and "psychological problems/depression 'can't work.'"  (*See id.*).  Dr. Youssef's examination revealed no focal deficits except for mildly reduced (5-/5) strength in the right deltoid and biceps muscles.  (*See id.* at 4 of 121).  Dr. Youssef recommended an MRI scan of the cervical spine and EMG studies of her right upper extremity, which were performed on June 13, 2007.  (*See id.* at 5 of 121; Doc. # 8-9 at 4-7 of 112).   The EMG was normal and the MRI results showed resolution of the C5-6 disc herniation that had been seen in 2005 after the accident and minimal neural foraminal narrowing at C4-5 bilaterally and C7-T1 on the left.  (*See* Record (Doc. # 8-8) at 120 of 121).  Dr. Youssef concluded on August 2, 2007 that Ms. Seely had cervical whiplash syndrome with resolving C6 radicular features and mild C7 radicular features and that there was no reason to proceed with surgical treatment.  (*See id.* at 120-21 of 121).  He recommended follow-up on an as-needed basis.  (*See id.* at 120 of 121).

On March 13, 2008, Ms. Seely returned to Dr. Scott, reporting a reoccurrence of right shoulder pain.  (*See* Record (Doc. # 8-8) at 114-117 of 121).  Dr. Scott found she had a negative impingement sign and excellent strength in the right shoulder.  (*See id.* at 116 of 121).  Dr. Scott injected her right shoulder with anesthetic, which gave her very little if any relief.  (*See id.* at 117 of 121).  Dr. Scott was concerned "about this whole idea of her perception of the persistence of pain at a time when she had told me she had good relief. . . . (*See id.* at 116 of 121).  Ms. Seely saw Dr. Isser-Sax on the same day for complaints of

head, neck, and arm pain, after experiencing eight to nine months of relief.  She also complained of vision loss and seeing peripheral images with headaches.  (*See id.*).  Plaintiff reported that she was still using Motrin and Flexeril, which were helpful, and requested a further radio frequency lesioning procedure.  (*See id.*).  Ms. Seely could lift 25-30 pounds with her left arm, could lift eight to ten pounds with her right arm, and had difficulty extending her right arm.  (*See id.*).  Dr. Isser found she had functional range of cervical motion and full strength in the upper extremities.  (*See id.*).  She diagnosed neck pain and cervicalgia, recommended a functional capacity evaluation, performed repeat radio frequency lesioning of medial branch nerves, refilled her medications, and gave her an additional prescription to use when traveling overseas.  (*See id.* at 2-3 of 112).  Dr. Isser concluded that Ms. Seely was at maximum medical improvement, although she would "require repeat bilateral C2-C3 radiofrequency lesioning approximately one time a year for the next three years if needed, as well as oral medications and physical therapy as needed.  (*See id.* at 3 of 112).

Sue B. Earl, M.P.T., performed a functional capacity evaluation on May 16, 2008.  (*See* Record (Doc. # 8-9) at 8-16 of 112).  Ms. Earl reported that Ms. Seely demonstrated poor tolerance to heavy lifting, decreased ability to grip with her right hand, and limitations in prolonged use of the right arm in an elevated position and concluded that Ms. Seely's functional abilities did not meet the job demands of a construction worker.  (*See id.* at 15 of 112).

Daniel Bruns, Psy.D. conducted additional psychological testing on May 29, 2008.  (*See* Record (Doc. # 8-9) at 45-51 of 112).  The test results indicated that

> If objective medical findings corroborate this patient's reports of localized severe and intolerable pain, her reported depression and anxiety may be a reaction to her condition.  If not her profile may suggest a somatoform disorder of the histrionic type, with diffuse

14

> unexplained pain symptoms associated with high levels of
> emotional distress. Psychological treatment for pain management,
> depression, and anxiety should be considered.

(*See id.* at 48 of 112).

In response to an inquiry from Ms. Seely's lawyer, on June 16, 2008, Dr. Isser-Sax reported that Ms. Seely had constant daily headaches and chronic neck pain caused by her automobile accident on October 24, 2005.   (*See* Record (Doc. # 8-9) at 53 of 112; *see also* Doc. # 8-9 at 102-03 of 112 (same)).  Dr. Isser-Sax stated that Ms. Seely's June 2007 MRI showed resolution of her C5-6 disc herniation and that radio frequency lesioning had helped with her headaches.  (*See id.*).

Ms. Seely started treatment with Daniel S. Bennett, M.D. in May 2008.  (*See* Record (Doc. # 8-9) at 93-99 of 112).  Ms. Seely complained of headaches, dizziness, ringing in the ears, numbness and cramping in the extremities, urinary incontinence, forgetfulness and confusion, and a tendency to drop things.  (*See id.* at 95 of 112).  Dr. Bennett treated her with cervical nerve blocks and medication for "Facet Arthropathy with painful dysesthesias, Bilateral" between June 2 and October 21, 2008.  (*See id.* at 73-91 of 112).  In a form report to the Colorado Department of Human Services dated September 10, 2008, Dr. Bennett indicated that Ms. Seely was unable to work at any job for six months or more due to cervical spondylosis, chronic pain, and neck strain.  (*See id.* at 71-72 of 112).  Also on September 10, 2008, Dr. Bennett responded to interrogatories from Ms. Seely's lawyer in her motor vehicle accident case.  (*See id.* at 69-70 of 112).  Dr. Bennet stated that she would need radio frequency lesioning indefinitely, and that the procedure was effective for 422 days.  (*See id.* at 69 of 112).  Dr. Bennett stated that Ms. Seely had no physical limitations when her pain was controlled and that with appropriate treatment there was a good probability she could return

to her work as a painter/construction worker.  ((*See id.* at 69-70 of 112).

Richard J. Sanders, M.D. examined Ms. Seely on August 25, 2008 "to evaluate her for" possible "right thoracic outlet syndrome."  (*See* Record (Doc. # 8-9) at 64-68 of 112).  Ms. Seely told Dr. Sanders that over the last two and a half years, her headaches and hand paresthesias had intensified, while her other symptoms had "reduced a little."  (*See id.* at 64 of 112).  Dr. Sanders administered a right pectoralis minor block and right scalene muscle block, to which Ms. Seely responded well.  (*See id.* at 67 of 112).  Dr. Sanders recommended surgical decompression of the right pectoralis-minor and thoracic outlet areas in light of the failure to respond to conservative therapy.  (*See id.* at 68 of 112).  In October 2008, Ms. Seely reported no change in her symptoms.  (*See* Record (Doc. # 8-10) at 66-68 of 71).  On October 22, 2008, Dr. Sanders performed right scalenectomy, first rib resection, and pectoralis minor tenotomy.  (*See id.* at 63-65 of 71).

Ms. Seely saw James F. Georgis, O.D. in Pueblo, Colorado on February 24, 2009 for complaints of vision problems.  (*See* Record (Doc. # 8-10) at 31-44 of 71).  Dr. Georgis prescribed yoked prism glasses.  (*See id.* at 31-32 of 71).  In July 2009, Plaintiff reported improved eye-hand coordination and said she could sew and work with stained glass with ease.  (*See id.* at 7-8 of 71).  She also said that her jaw spasms, tinnitus, peripheral hallucinations, and photophobia had completely resolved, that her memory, depression, and sleep problems were much better, and that she was "80% back to where she was before her accident."  (*See id.*).

Timothy O. Hall, M.D., examined Ms. Seely on May 28, 2009 for complaints of head and neck pain.  (*See* Record (Doc. # 8-9) at 111-112 of 112).  Dr. Hall determined that she had tension-type and "TMJdriven" headaches and administered Botox injections.  (*See id.* at

16

112 of 112).

On a referral from Dr. Georgis, Ms. Seely saw Rand L. Redfern, D.D.S. on May 28, 2009 for headaches and jaw pain. (*See* Record (Doc. # 8-10) at 52-61 of 71). Dr. Redfern prescribed a splint ("a maxillary diagnostic occlusal appliance") to stabilize her temporomandibular joints. (*See id.* at 53-54 of 71). Ms. Seely saw Dr. Redfern between June and October of 2009 and told him that she felt better the last two months than she had felt in four years. (*See id.* at 45-51, 46 of 71).

On August 27, 2009, Dr. Hall noted that Ms. Seely was doing "very nicely" following her Botox injections with less headaches, far less pain generally, and far less muscle spasm. (*See id.* at 110 of 112). Ms. Seely no longer had to take any pain medication and was doing home exercises. (*See id.*). Dr. Hall administered another series of Botox injections. (*See id.*).

On November 23, 2009, Ms. Seely reported to Dr. Sanders that her symptoms were much better, that she rarely had pain in her right hand or arm, that her neck pain was somewhat reduced, and that she still had right chest wall and axilla pain with activity. (*See id.* at 62 of 71). On November 24, 2009, Dr. Hall reported that Ms. Seely could lift 20 pounds occasionally, stand/walk for six hours and sit for six hours in an eight-hour workday, could frequently reach and occasionally bend, squat, crawl, and climb; could use her hands for repetitive actions but could not reach and work above shoulder level; and had no impairment of concentration. (*See* Record (Doc. # 8-10) at 69-70 of 71). Dr. Hall anticipated that her headaches could cause her to be unable to work three days or less per month. (*See id.* at 70 of 71). Dr. Hall indicated that Botox injections had helped considerably with her neck pain and headaches, that she was not in need of medication, and that she was functioning much better with improved pain control. (*See id.* at 71 of 71).

2.      Ms. Seely's Hearing Testimony

Ms. Seely was 46 years old on the amended date of the alleged onset of disability.  She

was 50 years old on the date of the ALJ's decision.  (*See* Record (Doc. # 8-2) at 35-36 of 78).

She had two years of college education in early childhood education and forestry, but did not

receive an associate degree or any certificates. (*See id.* at 36 of 78; Doc. # 8-7 at 56 of 65).

At the December 16, 2009 hearing, Ms. Seely testified via telephone that in 2006, she earned

about $8,000 sewing curtains and repairing chairs for friends and working as an art teacher

for the school district.  (*See id.* at 37, 50 of 78; *see also* Doc. # 8-5 at 16-17, 28 of 29).  She

testified that she no longer sewed curtains or repaired chairs because "I just haven't found any

jobs." (*See id.* at 38, 57 of 78).  She testified that she was unable to continue teaching art

classes because of classroom noise and headaches, and because she did not have a degree.

(*See id.* at 50 of 78).  She testified that she could sit for 15-20 minutes at a time, stand for two

to three hours at a time, walk about a mile, lift 15 to 20 pounds with her left hand, and lift eight

to 10 pounds with her right hand.  (*See id.* at 39 of 78).  She testified that she lives in a mobile

home by herself, reads books and newspapers, sews, does "some stained glass things" and

"beadwork," does neck exercises, walks every day, and does her own laundry, grocery

shopping, cooking, and light cleaning.  (*See id.* at 40-41, 48-49 of 78).  She makes trips back

and forth to Denver every month.  (*See id.* at 38 of 78).  She planned to start prerequisite

courses in interior design in January of 2010.  (*See id.* at 59 of 78).

Ms. Seely sees Dr. Hall, Dr. Redfern and Dr. Georgis regularly.  (*See id.* at 43-44 of

78).  Dr. Hall is her primary care provider. She has seen him for nine months, once every

three months.  She has seen Dr. Redfern about once a month for almost a year for jaw

spasms.  She sees Dr. Georgis once a month for her vision.  (*See id.* at 44-45 of 78).  She

was not currently seeing a psychologist or psychiatrist and was not taking any prescribed medications. (*See id.* at 45 of 78).  Since having Botox injections she had severe headaches one or two days per month. (*See id.* at 52-53 of 78).  Her worst problem was headaches and her neck pain "isn't so bad." (*See id.* at 58 of 78).  Ms. Seely's new glasses have improved her vision problems. (*See* Record (Doc. # 8-20 at 54-55 of 78).  She testified that "I can walk and my balancing is okay now." (*See id.* at 57 of 78).

### 3.    Vocational Expert's Hearing Testimony

Mr. Martin Rauer, M.A. attended the December 16, 2009 hearing and testified as a vocational expert ("VE"). (*See* Record (Doc. # 8-2) at 60-71 of 78; (Doc. # 8-4) at 29 of 35). Mr. Rauer categorized the occupationally significant characteristics of Ms. Seely's past work pursuant to the Dictionary of Occupational Titles ("DOT"). (*See id.* at 60-61 of 78).  The ALJ asked Mr. Rauer to assume a hypothetical individual the same age and with the same education and work experience as Ms. Seely, who could: occasionally lift 20 pounds, frequently lift or carry up to 10 pounds, and sit, stand or walk with normal breaks for a total of five hours in an eight-hour work day, occasionally balance, stoop, crouch, kneel, and crawl, frequently climb stairs and ladders, and should avoid overhead reaching bilaterally. (*See* Record (Doc. # 8-2) at 62-63 of 78).  Mr. Rauer testified that such individual could perform the duties required as a house-sitter, call-out operator, companion, front desk clerk, or gate guard. (*See id.* at 64-65 of 78).  Based on the findings of the VE, the ALJ found that Ms. Seely could work as a companion, gate guard, and front desk clerk and thus, she is not disabled as defined in the Act. (*See* Record (Doc. # 8-2) at 26-27 of 78).

4.      Court's Conclusions

Ms. Seely claims that the Commissioner erred: (1) by failing to find that her headaches, vision problems, and depression are severe impairments that limit her RFC; and (2) by relying on an RFC determination four years after Ms. Seely was in a motor vehicle accident in 2005 and her condition was improved by multiple treatments and by "failing to address the longitudinal history of claimant's condition and whether during the duration of that history, she was disabled for more than one year." (*See* Doc. # 14 at 3 of 39;  Doc. # 16 at 6-11 of 12). Ms. Seely argues that the ALJ should have assessed her RFC prior to treatment by Drs. Sanders, Bennett, Hall, Georgis, and Redfern and considered whether she was disabled for a closed period of disability benefits.  (*See* Doc. # 14 at 38 of 39;  Reply Brief (Doc. # 16) at 5-11 of 12; *see also* Ms. Seely's Written Argument in support of the Request for Review of Hearing Decision of Administrative Law Judge (Doc. # 8-6) at 91 of 92).  The Commissioner responds that substantial evidence supports the ALJ's assessment of Ms. Seely's RFC.

a.      Headaches, Vision Problems, and Depression

The evidence supports the ALJ's finding that Ms. Seely's depression, vision problems, and headaches are not severe impairments that limit her RFC.  First, the ALJ concluded that Dr. Cotageorge's opinion that Ms. Seely had serious limitations as a result of depression was not consistent with the entire record.  (*See* Doc. # 8-2 at 20-21 of 78).  The ALJ noted that substantial evidence outweighed Dr. Cotageorge's opinion because during the same time period, Ms. Seely sought no treatment for depression, Dr. Martin found she had "very mild" situational depression, Dr. Isser stated she was only "somewhat depressed," treating sources noted few depressive symptoms, and no treating source reported functional limitations

20

attributable to a mental impairment. (*See id.*; Doc. # 8-7 at 36, 38 of 65). *See Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir. 1987) (opinion of a physician who saw a claimant over a period of time for purposes of treatment is generally entitled to more weight than the opinion of a physician who saw the claimant only once). *See also* 20 C.F.R. § 404.1527(c). Ms. Seely's own evidence demonstrated that she was able to participate in a variety of activities during the period of her alleged disability, including sewing, repairing chairs, driving as far as Denver, walking as much as a mile daily, kayaking, kite flying, reading books and newspapers, doing crafts such as stained glass and bead work, doing exercises, grading papers, teaching art classes, doing laundry, shopping, cooking, performing light housework, doing odds and ends jobs, and attending classes. (*See* Doc. # 8-2 at 24, 37-43 of 78; Doc. # 8-8 at 7, 10, 33, 37 of 121). *See Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993) (claimant's daily activities are a relevant factor in assessing the severity of the claimant's symptoms). The minimal evidence of symptoms of depression in the medical record and the evidence of Ms. Seely's activities of daily living support the ALJ's determination that she did not have significant mental limitations due to depression.

Second, prior to February 2009, Ms. Seely's complaints of vision problems were infrequent and no physician diagnosed an impairment of vision. *See Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004) (no indication in administrative record that plaintiff ever diagnosed with a problem that required any form of extensive evaluation or treatment). Ms. Seely first sought treatment for her vision problem from an ophthalmologist in February 2009. (*See* Record (Doc. # 8-10) at 31-44 of 71). She reported resolution of her complaints in July 2009, after Dr. Georgis prescribed yoked prisms. (*See id.* at 7-8 of 71). The record supports the ALJ's determination that Ms. Seely's visual impairments did not limit her RFC during the

period of time she claimed she was disabled.

Third, Ms. Seely argues that the ALJ failed to consider the evidence that headaches limit her RFC. The ALJ considered Ms. Seely's headaches not as a separate impairment but as a symptom of her cervical spine impairment, as did several of her treating physicians. (*See* Doc. # 8-2 at 22, 24, 25 of 78; *see also, e.g.*, Doc. # 8-9 at 72 of 112 (where Dr. Bennett characterized Ms. Seely's headaches as a symptom)). During the period of her alleged disability, Ms. Seely also reported significant subsidence of her headaches from treatment, and that she was taking little to no medication. (*See, e.g.*, Doc. # 8-7 at 33, 41 of 65; Doc. # 8-8 at 10-11, 41-42, 47, 53, 65-66, 110 of 121; Doc. # 8-10 at 110 of 112). Between February 2006 and March 2007, Ms. Seely did not complain of headaches. Whether or not the evidence could support a different finding, there is substantial evidence to support the ALJ's finding. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted). The court may not reweigh the evidence and come to a different conclusion than the ALJ. *See Mounts v. Astrue*, 2012 WL 1609056, at * 8. There is substantial evidence in the entire record to support the ALJ's determination that Ms. Seely's headaches were not severe impairments that limited her RFC.

The ALJ's evaluation of the credibility of Ms. Seely's complaints further supports the determination of her RFC. (*See* Doc. # 8-2 at 22-25 of 78). After finding that Ms. Seely's impairments could reasonably be expected to cause the symptoms alleged, the ALJ considered her statements regarding her symptoms, the objective medical findings, the medical opinion evidence, her medications and other treatments, her daily activities, and

inconsistencies between her statements and other evidence in the record (*See* Doc. # 8-2 at 22-25 of 78).   These factors are all relevant in assessing credibility.   *See* 20 C.F.R. § 404.1529(c)(2);   *Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) (considering work record, positive response to medical therapy, failure to seek medical treatment, use of medications, and daily activities to evaluate subjective complaints); *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (noting factors to be considered in evaluating a claimant's credibility); *Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987) ("adjudicator must give full consideration to all of the evidence presented relating to subjective complaints") (internal quotation marks and citation omitted).   The ALJ's credibility determination is adequately supported by the specific evidence she relied on in evaluating Ms. Seely's credibility.   *See White v. Massanari*, 287 F.3d 903, 909 (10th Cir. 2001) (ALJ's credibility determination supported by reliance on specific evidence) (internal quotation marks and citation omitted). Other evidence in the record is consistent with the ALJ's determination of the credibility of Ms. Seely's subjective complaints.   For example, Dr. Scott expressed his concern about Ms. Seely's "perception of the persistence of pain at a time when she had told me she had good relief. . . ."   (*See* Doc. # 8-8 at 116 of 121).   He was surprised that "she had very little if any relief" from a local anesthetic injection and indicated that "frankly I am a little bit disillusioned by this. . . ."   (*See id.*).   Dr Sanders noted that an MRI of her cervical spine "showed disc bulges at C5-6 and C6-7, but these were not significant enough to explain her symptoms." (*See* Doc. # 8-10 at 66 of 71).

For these reasons, the ALJ's assessment of Ms. Seely's RFC was supported by substantial evidence and consistent with the applicable law.

b.      Closed Period of Disability

Ms. Seely further argues that the ALJ based the RFC finding on Dr. Hall's November 2009 assessment and failed to recognize that her impairments were of disabling severity prior to that time. (*See* Plaintiff's Opening Brief (Doc. # 14) at 36-38 of 39). The record, including the opinions of Ms. Seely's own treating physicians, supports the ALJ's determination that Ms. Seely was not disabled from October 25, 2005 to the date of the hearing on December 16, 2009. As the ALJ observed, Ms. Seely's treating sources repeatedly noted that while she was unable to return to her past work as a painter/construction worker, she was not precluded from performing less strenuous work. (*See* Doc. # 8-2 at 22 of 78). In June 2007, Dr. Isser indicated that Ms. Seely was unable to perform her previous work of painting and home improvement but was not totally disabled. (*See* Record (Doc. # 8-7) at 64-65 of 65). A functional capacity evaluation performed by Ms. Seely's physical therapists in May 2008 indicated that her functional abilities did not meet the physical demands for construction work but did not preclude less strenuous work. (*See* Doc. # 8-9 at 15 of 112). In September 2008, Dr. Bennett stated that Ms. Seely had no physical limitations when her pain was controlled and that with appropriate treatment she could probably return to her work as a painter/construction worker. (*See id.* at 69-70 of 112). This evidence and the entire record support the ALJ's decision. *See Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (ALJ must give controlling weight to treating physician's opinion if it is well-supported by medical findings and not inconsistent with other substantial evidence); *Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995) (fact that none of claimant's treating physicians placed any restrictions on his activities or opined that he was disabled supported ALJ's finding that he was not disabled). *See also* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion

is with the record as a whole, the more weight we will give to that opinion.").

IV.    Conclusion

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Ms. Seely was not disabled within the meaning of Title II of the Social Security Act and therefore not eligible to receive disability insurance benefits. Accordingly, IT IS RECOMMENDED that the Commissioner's final decision be AFFIRMED and this civil action be DISMISSED, with each party to bear her or his own fees and costs.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 17th day of January, 2013.

BY THE COURT:


s/Craig B. Shaffer
United States Magistrate Judge